# COURT OF APPEALS
## DECISION
## DATED AND FILED

## July 22, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP388**

Cir. Ct. No. 2019FA8

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN RE THE MARRIAGE OF:

GREGORY NICHOLAS GEISSINGER,

PETITIONER-APPELLANT,

V.

GAIL LOUISE MEYER,

RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Marathon County: SUZANNE C. O'NEILL, Judge. *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Gregory Nicholas Geissinger appeals from an order amending a judgment of divorce, which required him to pay Gail Louise Meyer an additional $19,057.65 as part of the parties' property division. Specifically, Geissinger argues that the circuit court erroneously exercised its discretion by reopening the judgment under WIS. STAT. § 806.07(1)(a) (2023-24),[1] and by adjusting the property division to provide equitable relief to Meyer in the amount of the difference between the sale value of certain personal property of the parties listed in the property division, and its appraised value as listed in the parties' marital settlement agreement, which was incorporated into the divorce judgment. We affirm.

## BACKGROUND

¶2 The parties to this action were married on July 29, 1983.[2] Geissinger filed for legal separation on January 7, 2019, and after the matter was converted to a divorce, the circuit court held a stipulated divorce hearing on April 8, 2022.

¶3 At the hearing, the parties presented a Marital Settlement Agreement ("the MSA") to the circuit court. Pursuant to the MSA, items of personal property

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] We pause here to note both counsels' failure to comply with aspects of the Rules of Appellate Procedure. Throughout his brief-in-chief, Geissinger frequently fails to include record citations after each sentence containing a factual proposition. Such a practice does not constitute "appropriate references to the record" in his statement of facts, as required by WIS. STAT. RULE 809.19(1)(d). Meanwhile, Meyer's response brief fails to include appropriate references to the record, instead citing only her brief's appendix. *See* WIS. STAT. RULE 809.19(1)(d)-(e), (3)(a)2. The appendix is not the record. *See United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322. We caution counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

that neither party wanted to retain were going to be sold, with the proceeds of the sale going to Meyer as part of Geissinger's equalization payment. In particular, the MSA stated that Meyer would receive: "Property listed which was jointly owned by the parties, but as part of the property equalization payment in an amount to be determined, resulting from the sale by [Geissinger] at a cost to be born[e] by [Meyer]. The appraisal cost of [the] same is $60,538.00."[3] Attached as Exhibit C of the MSA was a property division worksheet that listed "Marital Property to be Sold" as having a total value of $60,538, which sum was then put into Meyer's column of the property division.[4] Including this allocation, the total value of the property attributed to Geissinger and Meyer was $911,145 and $897,135, respectively.

¶4      At the April 8, 2022 hearing, both parties testified regarding the sale of the unwanted personal property. Geissinger specifically testified that it was his understanding that "those sale proceeds as an equalization payment in this matter will be all going to [Meyer]." He said this shortly after stating that the numbers in the property division worksheet attached to the MSA were those to which the parties had agreed, and shortly before testifying that, given the agreement to the auction sale, he believed "this property division" is "fair and equal" and

---

[3] The parties agreed to utilize the valuation for the personal property prepared by an appraiser. According to Geissinger, the appraisal was prepared by Jeremy Wheeler of Appraisals by Chuilli, LLC, and dated November 20, 2021, and December 2, 2021. As Geissinger notes in his brief, "This appraisal was the basis for the personal property division and negotiations concerning same for the final determination on the day of divorce."

[4] There appear to be two versions of the property division worksheet in the record. One is the version actually attached to the MSA found in the record; the second is a stand-alone exhibit. The former version includes the line item for the "Marital Property to be Sold," while the latter version has no such line item. The parties do not dispute that the property division worksheet attached to the MSA did, in fact, incorporate this line item with a value of $60,538.

"reasonable." For her part, Meyer opined that the values reflected in the property division worksheet constituted a fair and equitable arrangement. Shortly thereafter, she testified to her understanding of her entitlement to the sale proceeds of the unwanted personal property and how that process was part of the parties' "property division settlement today." There were no questions or testimony about what would happen if the personal property sold at auction for a sum different from its appraised value.

¶5    At the end of the hearing, the circuit court approved the MSA, finding it to be fair and equitable. In particular, the court stated:

> I find that the parties have divided their marital property as close to a 50/50 division as they wish to make it and that it is fair and reasonable to both. In making that finding, I do understand that the personal property will be subject to an estate sale, that the proceeds will then go to [Meyer].

The court incorporated the MSA into its "Findings of Fact, Conclusion[s] of Law, and Judgment of Divorce" ("the judgment") which states, in part: "The parties' [MSA] is found to be fair and reasonable as to all of its terms. This was found to be fair and reasonable under the circumstances presented to the Court." The court signed the judgment later that same day.

¶6    A few weeks thereafter, the unwanted personal property was sold at auction.[5] While the value of that property had been appraised at $60,538, the total

---

[5] The transcript from the April 8, 2022 hearing includes testimony establishing that some of the unwanted personal property was gifted—albeit outside the terms of the MSA—to the parties' children, all of whom were adults by that time. However, there does not appear to be anything in the record (at a minimum, neither party cites to any such information) reflecting which items of personal property were gifted or their value, either individually or in the aggregate. While Geissinger makes passing reference to these gifts in his brief-in-chief, he does not develop any appellate argument based on them. Accordingly, we discuss these gifts no further.

sale price was only $39,360.25. Once the costs of the auction were deducted, the net proceeds paid to Meyer were $31,234.08. Due to the lower-than-expected proceeds from the sale, Meyer filed a motion on July 26, 2022, seeking, in part, "readjustment of the property division equalization."

¶7      The circuit court held an evidentiary hearing on this motion on November 29, 2022. Meyer testified that her understanding of the MSA was that the $60,538 figure from the appraisal was being used to compute the property division, including Geissinger's equalization payment to her, and to "make it fair." She further stated that "it was not explained to me at the time that I was taking a risk by saying that I would take the monies from the auction. Had I known that was a risk, we would have rearranged who got what." On cross-examination, Meyer further testified that her understanding was that the appraised value of the items "was used as a value on the papers," referring to the attachments to the MSA. Furthermore, when asked whether she was told that she would receive the entire value of the personal property sold, regardless of whether that value was high or low, Meyer responded, "I was told that it was put on there as a figure to equalize and make it fair."

¶8      After hearing the parties' testimony and argument by counsel, the circuit court issued an oral ruling. First, the court made the following findings of fact: (l) there was an appraisal of the personal property to be sold and the appraised value of that property was $60,538; (2) the appraisal was conducted fairly; (3) there was a fair sale at auction, and the gross proceeds equated to $39,360.25; and (4) the total loss to Meyer from the sale was $19,057.65. In addition, the court ruled as follows:

> So when the Court does review the [MSA] and … the
> transcript [of the April 8, 2022 hearing], the Court

approved the [MSA] based upon the representation that the likely amount that [Meyer] … would receive from the sale of the personal property was over 60,000. She ultimately netted from that sale just over 31,000. When the Court found that the division of the personal property was equitable, it was fair and that it was as close to a 50/50 division as the parties wished to make it, the Court was relying upon that appraisal.

¶9    While the circuit court recognized that "appraisals often are mere estimates … that may not, in fact, come to fruition," the court further stated:

So in relying upon the appraisal, the Court inferred that Ms. Meyer would be receiving something close to 60,000. Ultimately she [received] 31,000 so that is a significant difference so the Court does believe [this] causes the property division to become inequitable. This court is a court of equity and in approving an agreement despite the fact that both parties agreed to this, that both parties knew that there was some risk, it was agreed to because parties were fairly relying upon an appraisal which was to divide the property equally and in making those calculations, both parties relied upon the property division worksheet. Both parties assumed that the value of the personal property would be something close to 60,000 and both parties then acted in good faith in trying to come up with a fair and equitable division of the property [and] awarded certain items to Mr. Geissinger in light of the anticipated proceeds from that sale. That sale did not happen in the way that it was anticipated to happen and again, Ms. Meyer ultimately lost approximately—well, over 20,000 from the lack of proceeds of that sale.

¶10    In all, the circuit court determined that the sale caused the property division to become inequitable and that it was appropriate to address these unexpected circumstances. The court specifically found that "everyone was acting under a misunderstanding and there was a mistake." The court iterated that it, too, had assumed the figures used in calculating the property division were accurate,

explaining: "[T]he Court as well was acting under the assumption that these numbers were all correct and they were not correct."[6]

¶11    After accounting for other changes in the parties' anticipated financial circumstances, the circuit court ultimately attributed a loss of $19,057.65 to Meyer resulting from the sale of the unwanted personal property.  Based in part on the court's view that "Meyer really is out from the original property division and equalization based again upon the discrepancy of … the property sale at auction," the written order entered after the hearing directed Geissinger to pay Meyer $19,057.65 to accomplish an equitable property division.  In that order, the court explained:

> [I]n light of the substantial shortfall in the sale proceeds, combined with [Meyer]'s filing of her motion very shortly after that [shortfall] was discovered, in the opinion of the Court, it would create an[] inequitable result in treating the actual received net sale proceeds of the sale as being the equivalent of their appraised value, which had been utilized for property division purposes in the Property and Debt Division Spreadsheet that was introduced at time of trial. Said spreadsheet placed the figure of $60,538 in [Meyer's] property division column, with the title "Marital Property to Be Sold".…  The Court finds in the interest of equity, that [Meyer] should be provided with additional moneys from [Geissinger] … to mitigate th[e] shortfall [from the auction sale].

Geissinger now appeals.[7]

---

[6] The circuit court also ruled that Meyer's motion was timely, stating, "[T]he Court does note that this motion again was filed relatively quickly after the stipulated divorce."

[7] Geissinger simultaneously filed a motion to reconsider along with his notice of appeal. The circuit court never ruled on this motion, and no further evidence was admitted into the circuit court record.  Accordingly, we do not further discuss that motion, except as noted in ¶23, n.9 of this opinion.

## DISCUSSION

¶12    The Wisconsin Supreme Court has repeatedly stated that a circuit court

> has authority to modify a property division under [WIS. STAT. §] 806.07.  Although a property division in a divorce is not subject to the court's continuing jurisdiction and may not be modified based on a change of circumstances under [WIS. STAT. §] 767.32(1), [§] 806.07 gives the court discretionary authority to grant relief from the judgment.

*Franke v. Franke*, 2004 WI 8, ¶21, 268 Wis. 2d 360, 674 N.W.2d 832 (quoting *Spankowski v. Spankowski*, 172 Wis. 2d 285, 290, 493 N.W.2d 737 (Ct. App. 1992) (citing *Thorpe v. Thorpe*, 123 Wis. 2d 424, 426, 367 N.W.2d 233 (1985))).[8] Relevant here, § 806.07(1)(a) gives a court discretionary authority to grant relief to a party on the ground of mistake.  Appellate courts review a circuit court's use of § 806.07 to reopen a divorce judgment as to property division only to determine whether the court erroneously exercised its discretion in doing so.  *See Tozer v. Tozer*, 121 Wis. 2d 187, 189, 358 N.W.2d 537 (Ct. App. 1984); *see also Conrad v. Conrad*, 92 Wis. 2d 407, 413-14, 284 N.W.2d 674 (1979).

¶13    "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination."  *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789 (alteration in original) (quoting *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)).  As long as the circuit court "reaches a rational,

---

[8] WISCONSIN STAT. § 767.32 (2001-02), was renumbered to WIS. STAT. § 767.59 by 2005 Wis. Act 443, §§ 148-159.

reasoned decision based on the application of the correct legal standards to the record facts," we will affirm the court's exercise of discretion on appeal. ***Sellers v. Sellers***, 201 Wis. 2d 578, 585, 549 N.W.2d 481 (Ct. App. 1996).

¶14     Geissinger argues that the circuit court erroneously exercised its discretion by reopening the judgment and adjusting the parties' property division to account for the difference in the sale value of the unwanted personal property and its appraised value. His argument is premised on two related contentions. First, he asserts that the parties—by their testimony at the April 8, 2022 stipulated divorce hearing—chose to be bound by the terms of the MSA, which has no language directing what would happen if the unwanted personal property sold for a sum different from the appraised value. Second, Geissinger asserts that, in structuring their MSA as they did, the parties agreed that the risk of the sale price being more or less than the appraised value would be shared between them—i.e., if the property sold for more than the appraised value, Meyer would receive a windfall; if it sold for less, Geissinger would benefit.

¶15     Conversely, Meyer contends that, at both the stipulated divorce hearing and the hearing on her postdivorce motion, she testified to her understanding that the fairness of the parties' overall property division was tied to the specific values the parties had stated in their property division worksheet, including the $60,538 appraised value of the unwanted personal property. Given that the parties used a specific number for the anticipated value of that property, Meyer contends that the parties did rely on that number in setting the property division that they deemed to be fair and equitable. As such, Meyer argues that the circuit court did not err by deeming it inequitable to allow the parties' mistake as to the actual value of the property to stand.

¶16 We conclude that the circuit court did not erroneously exercise its discretion because, given its factual findings supported by the record, it reasonably relied upon WIS. STAT. § 806.07(1)(a) to correct a material mutual mistake by the parties regarding the actual value of the unwanted personal property. The court, in its discretion, adopted Meyer's view of the facts and the corresponding impact on the equitable circumstances.

¶17 In particular, the circuit court made specific factual findings, including that the parties (and the court itself) tied the fairness of the sums allocated in the MSA to the notion that the unwanted personal property would be sold close to a particular value. In other words, the court found, based on the parties' testimony, that they did, in fact, rely on the appraised value to set their "fair" property division. As noted above, Meyer testified multiple times to this effect, and even Geissinger's testimony at the stipulated divorce hearing was consistent with this view. Moreover, the court's finding represents a reasonable reading of the MSA, given that the MSA omits any language stating what would happen if the unwanted personal property sold for a sum different from the appraised value.

¶18 The circuit court's findings in this regard are further supported by the fact that the MSA itself referenced an express appraised value of $60,538 for the unwanted personal property. It did not, for example, state merely that Meyer would receive whatever (unstated) sum resulted from the sale of the personal property. Although the MSA stated that the personal property would be included as part of the total property division "in an amount to be determined," the specific appraised value was then included in the property division worksheet attached to the MSA. In fact, that value was then put into Meyer's column of the property division in order to accomplish a calculated total property division of $911,145 to

Geissinger and $897,135 to Meyer. These facts further support the court's finding that the parties' overall agreement included an expectation that the sale value of the unwanted personal property would be at least relatively close to the appraised value.

¶19 From the foregoing, the circuit court's additional finding—that the parties' and the court's reliance on the appraised sum constituted a mistake—flowed naturally. And based on all of the court's factual findings, none of which are clearly erroneous, it was well within the circuit court's discretion to conclude that it would be inequitable not to order Geissinger to make a payment to Meyer to remedy the large difference.

¶20 To be sure, the circuit court could have found, in its exercise of that same discretion, that Geissinger's view of the parties' expectations—including their use of the appraised value in the MSA and related documents—was the factually accurate one. In doing so, it could have found that the parties only used the appraised value as a means to inform their respective risk assessments of what the unwanted personal property would actually sell for. And by not including any specific terms regarding what would happen in the event of a deviation from that value upon the actual sale, they intended to accept any such deviation, regardless of whom it benefited. That the court chose not to make findings of fact and conclusions consistent with this view does not mean it erroneously exercised its discretion. *See LeMere*, 262 Wis. 2d 426, ¶13.

¶21 None of Geissinger's appellate arguments overcome our conclusion that the circuit court did not reversibly err. First, Geissinger's comments regarding the events leading up to the auction—including what should have been Meyer's expectations regarding the sale of the unwanted personal property and

whether she assumed the risk of a lesser value being obtained—were factors for the circuit court to consider, which it did. Again, they do not provide a basis for us to conclude that the court erroneously exercised its discretion in its treatment of those facts. The key point that Geissinger misses is that the court ordered the modification not merely because the appraised and sale values of the property were different. Rather, the court did so because the values were *substantially* different, and for no apparent reason, thereby causing the property division to become inequitable.

¶22     Second, Geissinger's declaration that the circuit court "did not rely on any language of the MSA or any procedure set forth in the MSA to arrive at the amended property division" is of no help to him. Geissinger sits in no better of a position (or worse of one) than Meyer in light of the fact that the MSA was silent on what would happen if the sale value of the personal property differed from the appraised value, either at all or substantially so. Neither party opted to include language in the MSA clearly governing such circumstances. In any event, as explained earlier, the property division worksheet *was* part of the MSA, and its use of the $60,538 appraised value supports the parties' and the court's reliance on that value. This situation does not represent a court rewriting an agreement between the parties, as Geissinger contends but, rather, a court exercising its discretion to enforce the agreement in an equitable manner under particular circumstances.

¶23     Third, Geissinger contends that Meyer must have known that the amount to be awarded to her from the sale of the personal property was not a fixed sum because of a letter her attorney sent to Geissinger's counsel dated April 6, 2022—prior to the stipulated divorce hearing. In that letter, Meyer's counsel simply stated, at one point, that "[t]he total value of what you are offering as a

12

total settlement of all issues is $786,443, understanding that that number may vary depending upon the success of the auction." Even assuming it is proper for us to consider this letter (which is dubious),[9] the letter and its one sentence on which Geissinger relies are not an admission that any and all results of the auction were a known risk to Meyer. As we have already explained, the parties plainly could have both expected that the actual sale value would not be equal to the appraised value (indeed, that would have been a remarkable outcome) but at the same time expected that any such difference would be relatively small—not the roughly 40 percent deviation here. In any event, based on Meyer's testimony during the two relevant evidentiary hearings, the circuit court made a contrary finding regarding Meyer's understanding, which, again, is not clearly erroneous, even with the noted language in counsel's letter.

¶24    Finally, Geissinger argues that the circuit court's reopening of the judgment undermines the finality of divorce judgments that are freely and properly entered into by the parties and accepted by the circuit court, and it would lead to absurd results. Relatedly, he contends that the court improperly revalued the parties' property after the date of the final divorce. These arguments fail for multiple reasons. First, at the stipulated divorce hearing, everyone knew the auction sale was to happen at a later date and that the accomplishment of the auction was a material term for the MSA and its equitable property division.

---

[9] The letter from Meyer's counsel was sent in response to a letter dated a day earlier from Geissinger's counsel. The correspondence was apparently done as an effort at settlement. Beyond the problems inherent with relying on such attorney settlement discussions generally, neither counsel's correspondence was presented to Meyer at the evidentiary hearing on November 29, 2022, nor were they considered by the circuit court at that hearing or in its ruling on Meyer's postdivorce motion. Indeed, the letters are only attached as exhibits to Geissinger's March 6, 2023 Motion to Reconsider, which was filed the same day as his notice of appeal and was never addressed by the circuit court.

Second, and relatedly, once the sale yielded a much lower total value for the unwanted personal property, Meyer promptly filed her motion to address that outcome; she certainly did so well within the one-year period required under WIS. STAT. § 806.07(2). Finally, each case regarding motions to reopen a divorce judgment must, like this case, be closely tied to its particular facts. What the circuit court did here, and why it did so, does not reflect the kind of slippery slope context of which Geissinger warns.

¶25 Our conclusion is also consistent with governing case law. Suffice it to say, none of the cases cited by the parties have circumstances that are sufficiently on point to those here, and no holding in any of those cases compels a different result than what we reach here. *See **Doheny v. Kohler***, 78 Wis. 2d 560, 254 N.W.2d 482 (1977); ***Conrad***, 92 Wis. 2d 407; ***Taylor v. Taylor***, 2002 WI App 253, 258 Wis. 2d 290, 653 N.W.2d 524; ***Winkler v. Winkler***, 2005 WI App 100, 282 Wis. 2d 746, 699 N.W.2d 652; ***Hottenroth v. Hetsko***, 2006 WI App 249, 298 Wis. 2d 200, 727 N.W.2d 38; ***Pulkkila v. Pulkkila***, 2020 WI 34, 391 Wis. 2d 107, 941 N.W.2d 239.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.