COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2310**

STATE OF WISCONSIN

Cir. Ct. No. 2020FA112

IN COURT OF APPEALS
DISTRICT III

IN RE THE MARRIAGE OF:

STEPHANIE ANN FEUCHT,

PETITIONER-RESPONDENT,

V.

BERT NICHOLAS FEUCHT,

RESPONDENT-APPELLANT.

APPEAL from a judgment of the circuit court for Oconto County: JAY N. CONLEY, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Bert Nicholas Feucht appeals from a judgment of divorce following his marriage to Stephanie Ann Feucht.[1] Bert challenges the circuit court's rulings with respect to child support, maintenance, and property division. For the reasons that follow, we reject all of Bert's arguments on appeal, and we affirm the circuit court's judgment of divorce.

## BACKGROUND

¶2 Bert and Stephanie were married on October 15, 2010, and Stephanie filed a petition for divorce with minor children on September 3, 2020. Although the parties were able to reach a partial marital settlement agreement as to custody and placement of their children, several issues pertaining to property division, child support, and maintenance were tried to the circuit court.

¶3 At trial, the parties presented evidence regarding real property they had accumulated during the marriage. For the purposes of this decision, the property at issue includes the land on which the family home is built as well as an additional 18.5 acres—totaling thirty acres—in Lena, Wisconsin, which was gifted to Stephanie by her parents during the parties' marriage (hereinafter, the Lena property), and parcels of vacant, landlocked property in Fond du Lac County that Bert owned—purchased before and during the marriage—both individually and with members of his family (hereinafter, the Fond du Lac property). Both Stephanie and Bert presented expert testimony regarding the values of those properties.

---

[1] Because the parties share a surname, we refer to them by their first names throughout the remainder of this opinion.

¶4     The parties also testified about their employment for purposes of the circuit court's child support and maintenance determinations. Given Stephanie's allegation that Bert was shirking, the president of Bert's former employer, Michael Abhold, testified regarding Bert's termination from Abhold's company. He stated that Bert had been terminated, after several conversations, due to persistent attendance issues.

¶5     During the two days of trial, the circuit court repeatedly reminded the parties to tailor their presentations to the relevant issues and urged them to move on from topics that were not material. The court set a clear date and time for the completion of testimony. However, the court ultimately decided to allow the parties to present further submissions to the court following the trial—in the form of post-trial briefs and offers of proof—and both parties did so.

¶6     The circuit court then issued its memorandum decision, addressing the division and ownership of the parties' cash and deposit accounts, retirement accounts, the Lena property, the Fond du Lac property, vehicles and personal property, child support, and maintenance. The court denied maintenance to both parties, noting that Stephanie did not request maintenance and that Bert did not request it until his post-trial submission. According to the court, Bert's maintenance "argument [was], largely, undeveloped and insufficient," and he "is[] perfectly[] capable of supporting himself."

¶7     As to child support, the circuit court imputed income to Bert based on its finding that Bert's "job choices [were] voluntary and unreasonable" and that he "willfully[] ignored the directions from his employer." Based on its finding that Abhold was "a very credible witness," the court determined that Bert's change in employment—and the resulting reduction in both his hours and his hourly wage

from $53 an hour to approximately $38—"was a voluntary or self-inflicted change in his financial circumstances due to his irresponsible job attendance."

¶8 As to property division, the circuit court first found that the Lena property was Stephanie's individual property because its status as a gift was "uncontroverted." Given the fact that the family home was built on the Lena property and the court awarded that home to Stephanie, it determined the value of both the land and the improvements, based on the expert witness testimony, and then subtracted the value of the land from the total value of the property to determine Stephanie's net award.

¶9 The Fond du Lac property was awarded to Bert. The circuit court did not, however, award him any credit for premarital ownership because the property had been "commingled with the marital estate and marital property has been used for debt and taxes on the property." Further, it observed that Stephanie was assuming the mortgage on the family home, which was "related to some or all of the parcels."

¶10 The Fond du Lac property's value was also highly contested. Stephanie's expert, Brian Carter, testified that the land was worth $5,600 an acre, but his figure was not adjusted for the property's landlocked status. Bert's expert, James Hock, testified that the land was valued at $500 an acre, but Bert later argued that the value was $0 an acre. Ultimately, the circuit court valued the Fond du Lac property at $3,000 an acre as a "middle path."

¶11 Finally, with regard to the parties' retirement accounts, the circuit court stated that the expert witnesses had difficulty valuing those accounts because of the difference in interest rates and retirement ages they used. Given the unclear evidence, the court concluded that an equal division would be the "equitable way

to handle these accounts." The court also considered evidence that most of the value of Bert's retirement account accrued before the marriage; accordingly, it credited Bert $52,867 in marital property that he had previously withdrawn from certain accounts while the divorce was pending.[2] Bert now appeals.[3]

## DISCUSSION

¶12 On appeal, Bert challenges the circuit court's decision on six grounds: (1) the court "committed an error of law by failing to engage in the required shirking analysis, leading to an excessive child support award"; (2) the court erred "by failing to apply the proper legal analysis of tracing and donative intent to find that the [Lena property] lost its original individual nature"; (3) the

---

[2] Bert admits that while the divorce was pending, he withdrew $10,000 from the parties' joint savings and $42,867 from an IRA, totaling $52,867 (hereinafter, the withdrawal credit). Stephanie requested that those amounts be credited to Bert as a property division advance.

[3] We pause here to note deficiencies in both sides' appellate briefs based on the failure to comply with the Rules of Appellate Procedure. First, we observe that at various points in his argument section, Bert fails to provide proper citations to the appellate record. *See* WIS. STAT. RULE 809.19(1)(e) (2023-24). Further, throughout Stephanie's briefing, she references facts in the record by citing only to her appendix. A party must include appropriate references to the record in its briefing. WIS. STAT. RULE 809.19(1)(d)-(e) (2023-24). The appendix is not the record. *United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322.

Additionally, Stephanie cites two unpublished, per curiam opinions in her response brief. And while Bert takes the time to identify these cases for us, his own briefing also contains a citation to an unpublished, per curiam opinion. All of these citations violate WIS. STAT. RULE 809.23(3) (2023-24), which clearly prohibits the citation of a per curiam opinion unless exceptions that are not relevant here apply.

As a high-volume appellate court, we expect briefing by an attorney to follow the basic Rules of Appellate Procedure. We caution both parties' counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

court "erroneously exercised its discretion by disregarding testimony that the Fond du Lac [property] had limited to no value due to [its] landlocked status"; (4) the court erroneously exercised its discretion "by failing to explain why Bert received no clear credit for premarital assets"; (5) the court erroneously exercised "its discretion by failing to apply the statutory factors to its property division or maintenance decision[s]"; and (6) the court's "order requiring 'offers of proof' instead of evidence deprived Bert of the right to present his case." For the reasons that follow, we reject each of Bert's arguments.

*I. Child support*

¶13    Bert first argues that the circuit court erred by failing to conduct a proper shirking analysis within its child support determination. When considering a child support obligation, a circuit court may use a parent's earning capacity to calculate his or her child support obligation, rather than the parent's actual income, only if the court concludes the parent has been "shirking." ***Chen v. Warner***, 2005 WI 55, ¶20, 280 Wis. 2d 344, 695 N.W.2d 758. Here, at the time Bert was terminated from his former employer, he was making $53 an hour and had forty hours of work available to him each week. His current position, however, pays only $38.86 an hour, and he works part-time—thirty-four to thirty-six hours a week. Thus, Stephanie alleged that the court should "impute income to [Bert] because his earning capacity is greater than his present wages." The court agreed, imputing income of $9,186 a month to Bert, and based upon that imputed income, ordering Bert to pay $300.41 per month in child support.

¶14    "To conclude that a parent is shirking, a circuit court is not required to find that a former spouse deliberately reduced earnings to avoid support obligations or to gain some advantage over the other party." ***Id.*** "A circuit court

need find only that a party's employment decision to reduce or forgo income is voluntary and unreasonable under the circumstances." *Id.* "[T]he application of the legal standard, reasonableness, to the facts is a question of law determined independently by an appellate court, but with appropriate deference to the circuit court because the legal conclusion is extensively intertwined with factual conclusions." *Becker v. Becker*, 2014 WI App 76, ¶17, 355 Wis. 2d 529, 851 N.W.2d 816. "The burden of showing reasonableness is on the party who reduces or forgoes income." *Chen v. Warner*, 2004 WI App 112, ¶14, 274 Wis. 2d 443, 683 N.W.2d 468, *aff'd*, 280 Wis. 2d 344.

¶15 We conclude, under the circumstances of this case and giving appropriate deference to the circuit court's decision, that the court properly concluded that Bert was shirking. First, as to whether Bert's job change was voluntary, *see Chen*, 280 Wis. 2d 344, ¶20, Bert alleges that it was not voluntary because he was terminated from his employment. While we acknowledge that Bert was terminated and did not voluntarily leave his employment, the court found that Bert "willfully[] ignored the directions from his employer" and, therefore, that "[t]his was a voluntary or self-inflicted change in his financial circumstances due to his irresponsible job attendance." In other words, Bert's voluntary choice to miss work, despite his employer's stated concerns about those absences, caused him to be fired. The court's finding is supported by evidence in the record. As the court observed, based on Abhold's "very credible" testimony,

> [Bert's] problems at work began in late 2020 and continued into 2021 and then 2022. [Bert] was not showing up for work and began to hurt projects. He was first demoted from superintendent to carpenter—at the same rate of pay. There were multiple conversations with [Bert] about availability. There was an agreement on hours [Bert] was

to work and he worked less. [Bert] worked only eighteen hours the last week before he was fired. There were a number of conversations with [Bert] first. The [c]ourt believes, based on [Abhold's[4]] testimony, that [Bert's] employer was very patient with him and gave him multiple chances, and [Bert] did not show up for work, sufficiently. He appears to have come and gone as he pleased.

¶16 As to whether Bert's voluntary choice was reasonable, we conclude that, under the circumstances, the circuit court correctly found that Bert's employment choice was not reasonable. Bert failed to meet his burden to show that it was reasonable for him to refuse to adhere to his employer's attendance policy so he could remain at a job where he was making substantially more money. Although Bert argues that he "took time off work to care for his three children who were suffering various illnesses, including" COVID-19, as well as his own COVID-19 diagnosis, under the shirking analysis, "[t]he employment decision may be unreasonable even though it is well intended." *See Sellers v. Sellers*, 201 Wis. 2d 578, 587, 549 N.W.2d 481 (Ct. App. 1996). Furthermore, "[t]here is a limit to the unemployment or underemployment of a parent when the other parent 'is presented the bill for the financial consequences.'" *Chen*, 280 Wis. 2d 344, ¶46 (citation omitted). Thus, even if we accept that Bert was missing work to care for his sick children, we still conclude that, under the circumstances, the amount of missed work, the duration of time over which the attendance concerns occurred, and the failure to secure alternate child care even after repeated discussions and agreements on required hours with his former employer rendered Bert's termination both voluntary and unreasonable.

---

[4] We note that the circuit court's memorandum decision refers to Bert's former employer as "Mike Appel," but the trial transcript refers to him as "Michael J. Abhold." We assume this was a typographical error on the court's part.

¶17     Bert argues that this case is "analogous to *Chen*, but deserves even more recognition of Bert's situation." *Chen* was a child support modification and shirking case involving the divorce of two physician parents. *Chen*, 280 Wis. 2d 344, ¶5. After discovering that she was unable to feasibly reduce her work hours and investigating the possibility of supporting the family through investment income, the mother left her job as a physician to stay home with the children. *Id.*, ¶¶8-10. Later, when the stock market declined, the mother sought to modify the father's child support obligation. *Id.*, ¶¶11-12. The father argued that the mother's termination of her employment and failure to accept part-time work outside the area where she lived amounted to shirking. *Id.*, ¶19. Our supreme court disagreed, concluding that the mother's employment decision was reasonable under the circumstances. *Id.*, ¶4.

¶18     According to Bert, "[i]f the [s]upreme [c]ourt in *Chen* ruled that a parent who voluntarily quit all employment to care for school-age children made a reasonable choice, then it cannot be rational that Bert is held to account for losing a job due to his children's illnesses." Bert asserts that there is no evidence that he "intentionally and unreasonably lost his job" or that "his stated reasons for missing work were other than a need to care for the children, and his own health diagnosis." Further, he notes that "[u]nlike [the mother in *Chen*], Bert found a well-paying job in his field immediately," he "had more salient reasons than [the mother in *Chen*] for his decreased income," and "his job situation has far less impact on the support in this matter." Finally, Bert states that the circuit court "made no effort to analyze the *Chen* factors."

¶19     Bert's attempts to compare the facts in *Chen* to those in this case miss the mark, and our supreme court's decision in *Chen* does not mandate a particular result here. Initially, we observe that the facts in *Chen* are not similar to

the facts here. Bert's decisions and motivations are not comparable to a parent deciding to leave his or her employment, with the initial support of the other parent, to take care of their children full time. The reasonableness inquiry is extensively intertwined with the factual findings in a case, *see Becker*, 355 Wis. 2d 529, ¶17, and given the circuit court's findings here, *Chen* does not lend support to Bert's position.

¶20 In terms of the circuit court's alleged failure to analyze the *Chen* factors, we note that our supreme court discussed the factors as ones "to be considered in determining the reasonableness of a parent's decision." *Chen*, 280 Wis. 2d 344, ¶50. The court specifically recognized, however, that the list is not exclusive, and the court never suggested that review of any particular factor was *required. See id.* The circuit court's decision in this matter intimates that it considered the factors that it deemed relevant to its determination of reasonableness, whether those specific factors were listed in *Chen* or not.

## II. The Lena property and the family home

¶21 Next, Bert argues that the circuit court erred by failing to apply the proper legal analysis to decide whether to include gifted property in the property division when it found that the Lena property was Stephanie's individual property. We first note that the division of property in divorce actions is entrusted to the circuit court's discretion, and we will not disturb the court's decision on appeal unless the court has erroneously exercised its discretion. *LeMere v. LeMere*, 2003 WI 67, ¶13, 262 Wis. 2d 426, 663 N.W.2d 789. Generally, we look for reasons to sustain the circuit court's discretionary decisions, *see Loomans v. Milwaukee Mut. Ins. Co.*, 38 Wis. 2d 656, 662, 158 N.W.2d 318 (1968), and we "may search the record to determine if it supports the court's discretionary determinations,"

10

*Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737. "[A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." *LeMere*, 262 Wis. 2d 426, ¶13 (alteration in original; citation omitted). Findings of fact will be affirmed unless clearly erroneous. WIS. STAT. § 805.17(2).

¶22 "The general rule is that assets and debts acquired by either party before or during the marriage are divisible upon divorce." *Derr v. Derr*, 2005 WI App 63, ¶10, 280 Wis. 2d 681, 696 N.W.2d 170. However, as relevant to this case, property acquired by gift is subject to a specific statutory exemption, which provides that gifted property is nondivisible. *See* WIS. STAT. § 767.61(2)(a); *Derr*, 280 Wis. 2d 681, ¶10. "When a party to a divorce asserts that property, or some part of the value of property, is not subject to division, that party has the burden of showing that the property is non[]divisible at the time of the divorce." *Derr*, 280 Wis. 2d 681, ¶11; *Brandt v. Brandt*, 145 Wis. 2d 394, 407-08, 427 N.W.2d 126 (Ct. App. 1988). Whether property is subject to division is a mixed question of fact and law. *See Derr*, 280 Wis. 2d 681, ¶45. We review the circuit court's findings of fact under the clearly erroneous standard, but the ultimate characterization of property as either divisible or nondivisible is a question of law that we review de novo. *Id.*, ¶¶45, 51.

¶23 The party asserting that property is a nondivisible gift—here, Stephanie—"must establish: (1) the original gifted or inherited status of the property; and (2) that the character and identity of the property has been preserved." *See Wright v. Wright*, 2008 WI App 21, ¶12, 307 Wis. 2d 156, 747 N.W.2d 690 (2007). "Identity," also called "tracing," "addresses whether the gifted or inherited asset has been preserved in some present identifiable form so

11

that it can be meaningfully valued and assigned." **Derr**, 280 Wis. 2d 681, ¶15 (citation omitted). "Character," also called "donative intent," "involves no more and no less than determining whether the owning spouse intended to donate non[]divisible property to the marriage, that is, did the owning spouse have donative intent." *Id.*, ¶23. Wisconsin courts have identified four circumstances that create a rebuttable presumption of donative intent: (1) "Transferring non[]divisible property to joint tenancy"; (2) "Depositing non[]divisible funds into a joint bank account"; (3) "Using non[]divisible funds to make purchases for the family"; and (4) "Using non[]divisible funds to make payments on a mortgage debt that was incurred to acquire jointly owned real estate." *Id.*, ¶¶34-38 (formatting altered).

¶24    Here, the circuit court found that it was "uncontroverted" that the Lena property was gifted to Stephanie by her parents. On appeal, Bert does not dispute that finding. As noted above, the court awarded the family home to Stephanie, but when determining the value of the family home, it removed the value of the Lena property from the divisible estate. Accordingly, Bert argues that the court improperly removed $110,000 ($40,000 for twelve acres and $70,000 for eighteen acres) from the divisible estate. According to Bert, neither the identity nor the character of the Lena property has been preserved.

¶25    Stephanie's father testified at trial that he had gifted his daughter the thirty-acre Lena property, that he had been gifted the property by his own father, that the land had been in his family for a long time, and that the Lena property is surrounded by properties owned by Stephanie's other family members. Stephanie's testimony also revealed that, despite building the family home on the Lena property, the land always remained titled in Stephanie's name and was never titled in Bert's name, nor was he included on any of the tax bills.

¶26     We conclude that the circuit court correctly found that the Lena property was gifted and that its identity and character did not change. The court determined that building the family home on the Lena property did not mean the gifted component could not be traced. The court found that the land could be meaningfully valued, and it determined that value based on the testimony of Stephanie's appraiser. *See Wright*, 307 Wis. 2d 156, ¶12; *Derr*, 280 Wis. 2d 681, ¶15. The court also determined that Stephanie did not have donative intent with regard to the Lena property because the property had only ever been titled in Stephanie's name, despite the fact that Stephanie was married, and it was surrounded by property owned by Stephanie's family. *See Wright*, 307 Wis. 2d 156, ¶12; *Derr*, 280 Wis. 2d 681, ¶23. Accordingly, we concur with the court's conclusion that Stephanie met her burden to prove that the Lena property is nondivisible, individual property.

¶27     In contrast, Bert's appellate arguments are not persuasive. He first contends that the tracing element cannot be satisfied. According to Bert, "the original gift of land can no longer be separated and assigned individually to satisfy the tracing element" because "[t]he home was built on this land"; "[w]ithout the land, there is no home, and vice versa." He fails, however, to cite any legal authority in support of his position that a parcel of property cannot be separately valued once a home is built on the land. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."). Land alone has value, and as the circuit court found, the value of land separate from its improvements is capable of being determined.

¶28     Bert's second challenge is to the circuit court's donative intent determination. According to Bert, two mortgage loans were taken out on the

marital home—a construction loan and a second mortgage—he is a debtor on those loans, and the loans were paid with marital income. "Thus," Bert argues, "three of the four factors of donative intent are met, and the entire 30 acres should be divisible."

¶29 We disagree that any of the factors creating a rebuttable presumption of donative intent have been met. *See Derr*, 280 Wis. 2d 681, ¶¶34-38. The Lena property was never transferred to joint tenancy; Stephanie remained the only one on the title. *See id.*, ¶35. The Lena property is not nondivisible *funds*, and it was also not used to make purchases for the family. *See id.*, ¶37. And finally, although the parties used marital funds to make mortgage payments on mortgage debt, the parties did not use nondivisible *funds* to pay mortgage debt. *See id.*, ¶38; *see also id.*, ¶62 ("We conclude that, without more, the act of putting property at risk by using it as collateral for a marital loan does not create a presumption that the owning spouse intended to donate part or all of the property to the marriage."). Further, Bert fails to cite any legal authority stating that when a home is built on land, there is either an automatic or presumptive finding of donative intent. *See Pettit*, 171 Wis. 2d at 646. We therefore affirm the circuit court's determination that the Lena property remained Stephanie's individual property.

## III. *The Fond du Lac property*

¶30 Bert next argues that the circuit court erred by finding that the Fond du Lac property had value despite its landlocked status. "[I]n valuing marital assets, courts are obligated to ensure that a fair market value is placed on marital property." *Schorer v. Schorer*, 177 Wis. 2d 387, 399, 501 N.W.2d 916 (Ct. App. 1993). "Fair market value is not a valuation method but a definition assuming a sale by one who desires, but is not obligated, to sell, and a purchase by

14

one willing, but not obligated, to buy." *Id.* The valuation of marital assets is a finding of fact, and we will not disturb the circuit court's finding unless it is clearly erroneous. *See id.* at 396. Further, "[t]he [circuit] court is the ultimate and final arbiter of the credibility of witnesses, and we must accept the [circuit] court's credibility determination." *Noble v. Noble*, 2005 WI App 227, ¶27, 287 Wis. 2d 699, 706 N.W.2d 166.

¶31 At trial, Stephanie presented expert testimony from Carter, a state licensed certified residential appraiser and an advisory appraiser on the Real Estate Association of Northeast Wisconsin's appraisal board. Carter opined—using data from comparable sales and to a reasonable degree of professional certainty in his field—that the per-acre value of the Fond du Lac property was $5,600, for a total of $526,400. Carter also noted that his appraisal considered data indicating that vacant land in the area had increased in value by eight percent since Bert had purchased a parcel of the Fond du Lac property. Further, Carter acknowledged at trial that he was aware of the Fond du Lac property's landlocked status, but he assumed that the property had an easement "[b]ecause a landlocked parcel cannot be sold without an easement, and apparently one of these parcels was purchased"—by Bert in 2018—"and it's landlocked."

¶32 In contrast, Hock, Bert's expert and a certified general appraiser licensed by the state, testified that based on his review of comparable real estate sales, a forty-acre landlocked parcel of the Fond du Lac property was valued at $20,000. Hock's appraisal focused on the fact that the property was landlocked, explaining that there is not a market for landlocked land because the market is "[o]nly to the adjacent property owners." In Bert's submissions following the trial, however, he disagreed with his expert, arguing instead that the land had no value.

¶33 We conclude that the circuit court's valuation of the Fond du Lac property is not clearly erroneous. The court acknowledged the discrepancies between the experts' opinions; noted the flaws in their opinions; and, accordingly, did not accept either of the experts' values outright. Instead, the court properly considered the testimony, as well as the circumstances, to reach "a middle path." The court specifically found Carter to be "credible and knowledgeable about the area," but it admitted that Carter did not account for the property's landlocked status. Thus, it relied on Carter's testimony and evidence to determine the property's maximum value: $5,600 an acre. The court then considered what Bert had paid for the property in 2018, noted Carter's testimony stating that there had been an eight percent increase in value since that time, and determined the minimum value by increasing Burt's purchase price by eight percent. The court then considered the statutory remedies to avoid a property's landlocked status—pursuant to WIS. STAT. § 82.27—to find that the fair market value would reasonably be a little higher than that minimum value. Thus, the court's credibility determinations and findings regarding the Fond du Lac property's fair market value of $3,000 per acre are supported by the record, and it committed no error.

¶34 Bert argues, however, that the circuit court erroneously exercised its discretion in two ways. First, Bert essentially argues that the court erred by relying on Carter's testimony instead of Hock's testimony. According to Bert, Carter "knew that the Fond du Lac [property was] landlocked, but [he] provided no adjustment to his value because he assumed that the parcels had easements for access," and he admitted that a landlocked parcel without an easement cannot be sold because "nobody is willing to pay for it." Hock, Bert argues, "was aware that the land had no easements," and he "expanded his comparable search for

landlocked properties to Department of Revenue listings," which "cast[] a broader net than simple realtor listings." Further, Bert cites *Preiss v. Preiss*, 2000 WI App 185, ¶¶14-15, 238 Wis. 2d 368, 617 N.W.2d 514, for the proposition that "[p]roperty that cannot be sold or transferred, or has value only to the owner, has no fair market value" and that "[i]f property has no value, the court cannot place an independent value upon it, and it should thus not be included as an asset in the marital estate."

¶35 As noted, the circuit court did not rely entirely on Carter's value for the Fond du Lac property. Instead, the court determined the fair market value by considering additional evidence in the record. Further, the court was entitled to determine that Carter was the more credible witness and to discount Hock's testimony. *See Noble*, 287 Wis. 2d 699, ¶15. Moreover, *Preiss* does not advance Bert's argument. One of the issues in *Preiss*, a divorce case, was whether the court properly included the value of one spouse's sick leave account as an asset of the marital estate. *Preiss*, 238 Wis. 2d 368, ¶11. We determined that the sick leave account was erroneously considered an asset of the marital estate because the spouse could not "convey his interest in the account; he [could not] gift it; he [could not] transfer it. Because the account ha[d] no cash value and [could not] be sold or transferred, it also [did] not have a fair market value." *Id.*, ¶14.

¶36 A sick leave account is not the same as landlocked real property, and Bert otherwise cites no legal authority in support of his claim that landlocked property has absolutely no value, particularly when situated adjacent to other property owned by Bert and his family. *See Pettit*, 171 Wis. 2d at 646. Thus, we cannot conclude that the circuit court's decision was clearly erroneous on this basis.

¶37    Second, Bert contends that even if the circuit court "wished to engage in its own analysis, it was required to state its reasoning" for "why it chose a specific value." (Formatting altered.) He cites *Ashraf v. Ashraf*, 134 Wis. 2d 336, 345-46, 397 N.W.2d 128 (Ct. App. 1986), for the proposition that "[i]f the court substitutes its own value of an asset to that of an expert, it must support that value with adequate reasoning." According to Bert, the court failed to provide "a reason for choosing $3,000 as opposed to any other number."

¶38    We disagree with Bert that the circuit court failed to fully explain its decision. In *Ashraf*, one of the issues was whether the court erred by "ignoring undisputed expert testimony that the future tax impact on [the husband's] IRA and Keogh plan was likely to be 25% and substituting its own figure of 15%, citing only 'policy and case law.'" *Id.* at 344-45. We explained that "the court cannot disregard uncontradicted testimony as to the existence of some fact or the happening of some event in the absence of something in the case which discredits the testimony or renders it against reasonable probabilities," and we further stated that "'[p]olicy and case law' is not a sufficient explanation." *Id.* at 345. These are not the facts here.

¶39    Hock's testimony was not uncontroverted, and the circuit court was entitled to find Carter more credible than Hock with regard to his appraisal. Further, the court explained in detail its decision not to rely entirely on Carter's appraisal, its decision to designate a minimum and maximum value based on the evidence in the record, and its reason for finding that the fair market value was more than the minimum value. Thus, the court's explanation included much more than a bare minimum statement like "policy and case law." *See id.* The court explained why it chose the $3,000 per acre value, and to the extent Bert contends that the court needed to explain why it chose $3,000 over $2,999, for example, or

any other amount between the minimum and maximum values it identified, Bert fails to present any legal authority requiring such specificity. *See Pettit*, 171 Wis. 2d at 646.

¶40    Finally, Bert argues that the circuit court's treatment of the Lena property and the Fond du Lac property was contradictory. According to Bert, "[t]he court refused to grant credit for Bert's [premarital] real estate [in the Fond du Lac property] because 'the property ha[d] been commingled with the marital estate and marital property ha[d] been used for debt and taxes on the property,'" but if "paying a mortgage and property taxes resulted in 'commingled' premarital assets, the same reasoning must apply to the tracing/donative intent analysis on the [Lena property]." Bert asserts that the court "provided no explanation for such differing treatment."

¶41    The circuit court treated the Lena property differently from the Fond du Lac property based upon the law. As noted above, under Wisconsin marital property law, upon Bert and Stephanie's marriage, the Fond du Lac property became a marital asset subject to division upon their divorce. *See Derr*, 280 Wis. 2d 681, ¶10. Bert does not argue that a statutory exception to that general rule applies with regard to the Fond du Lac property. However, as discussed in detail above, the Lena property was subject to an exception to the general rule that property becomes a marital asset, and Stephanie met her burden to prove its nondivisible status. *See supra* ¶¶21-29. Thus, we conclude that the court's fair market value determination for the Fond du Lac property was not inconsistent with its treatment of the Lena property and was not clearly erroneous.

19

*IV. Bert's retirement account*

¶42    Bert next argues that the circuit court failed to give credit to Bert for his premarital retirement assets. WISCONSIN STAT. § 767.61(3) provides that "[t]he [circuit] court shall presume that all property … is to be divided equally between the parties, but [the court] may alter this distribution" after considering several statutory factors. *See also **Hokin v. Hokin***, 231 Wis. 2d 184, 191-92, 605 N.W.2d 219 (Ct. App. 1999). When considering the statutory factors, the court is not "precluded from giving one statutory factor greater weight than another, or from concluding that some factors may not be applicable at all." ***LeMere***, 262 Wis. 2d 426, ¶25. Accordingly, the court's "failure to address factually inapplicable statutory factors will not be an erroneous exercise of discretion." ***Id.***, ¶26. Furthermore, an "incomplete consideration of the statutory factors" is also not a basis for reversal as an erroneous exercise of discretion, as the court's "failure to consider all the statutory factors might well be harmless, particularly where the overlooked factors are only marginally relevant or not relevant at all." ***Id.***, ¶27.

¶43    Bert contends that the circuit court's denial of premarital credit for Bert's retirement assets is unsupported. In particular, he argues that his expert valued Bert's premarital retirement contribution at $135,483 and that this value was uncontradicted because Stephanie's expert did not provide a premarital value. Thus, he asserts that the court erred by failing to grant credit to Bert for this amount and, instead, "granted a quasi-credit of $52,867"—the withdrawal credit— with "no reasoning for why $52,867 was the proper credit." According to Bert, "[t]he result … is a potential loss of [an] $82,616 premarital credit to Bert."

¶44 In its memorandum decision, the circuit court acknowledged the presumption of equal division but noted that it "may alter the distribution after considering the factors" in WIS. STAT. § 767.61(3)(a) through (m). The court further observed that "[a] number of those factors have relevance in this case" and stated that "[t]he chief factor causing controversy is … the property brought to the marriage by each party." *See* § 767.61(3)(b). The court recognized that both Bert's and Stephanie's experts "underlined the difficulty in giving these accounts a present value" because "[t]he figures change based on the interest rates used[] and retirement ages used." Thus, the court determined that "[t]he most equitable way to handle these accounts is to divide them all[] equally." Ultimately, the court divided the retirement accounts equally, but it awarded Bert the withdrawal credit.

¶45 The circuit court was not required to deviate from the presumption of equal division, and, accordingly, the court was also then not required to deviate from that presumption based on the figure provided by Bert's expert. *See e.g.*, ***Geise v. American Transmission Co.***, 2014 WI App 72, ¶13, 355 Wis. 2d 454, 853 N.W.2d 564 (explaining that the trier of fact "is not bound by expert opinions; rather, it can accept or reject an expert's opinion"). Bert's challenge merely expresses his disagreement with the court's exercise of discretion. Absent clear values for the retirement accounts and given the court's stated desire for an equitable outcome,[5] the court did not err by dividing the accounts equally and crediting Bert with the withdrawal credit.

---

[5] In deciding not to award Bert credit for the premarital aspects of the Fond du Lac property, the circuit court also considered the fact that "to this day" there is "some component of the present mortgage on the marital residence related to some or all of the [Fond du Lac property]" and recognized that Stephanie "will be paying that mortgage."

21

*V.  Statutory factors*

¶46     Next, Bert asserts that the circuit court erred "by failing to apply the statutory factors to its property division or maintenance decision."  Like the division of property, *see supra* ¶21, the determination of maintenance in a divorce action is reviewed for an erroneous exercise of discretion.  ***LeMere***, 262 Wis. 2d 426, ¶13.  Also like the division of property, *see supra* ¶42, a court must consider enumerated statutory factors before awarding maintenance to either party. *See* WIS. STAT. § 767.56(1c)(a)-(j).

¶47     According to Bert, the circuit court's maintenance decision was "insufficient" because it merely "list[ed] the factors, without analysis."  Again, he cites ***Ashraf*** for this proposition and cites ***Bahr v. Bahr***, 107 Wis. 2d 72, 82, 318 N.W.2d 391 (1982), for the general proposition that "while … courts have articulated the statutory factors to be considered in awarding maintenance, these factors have too often been recognized in form and ignored in substance."  As for the property division decision, he presents examples of facts that the court failed to address: (1) "Bert's contributions to the marriage in the form of building the marital home were acknowledged … but not analyzed in the decision"; (2) Bert's "contributions in the form of premarital real estate and retirement assets were ignored"; and (3) "[t]he fact that Stephanie obtained her education during the marriage, and had her education and vehicle debt paid."

¶48     In its memorandum decision, the circuit court stated that it was "denying [m]aintenance to both parties after reviewing [WIS. STAT. §] 767.56 and its factors."  In particular, the court explained that Stephanie "did not request [m]aintenance, and [Bert] did not either until after trial."  The court went on to observe that Bert's "argument is, largely, undeveloped and insufficient," and,

regardless, Bert "has a, considerably, greater earning capacity than [Stephanie], earning $116,938 gross as recently as 2020" and "is[] perfectly[] capable of supporting himself."

¶49    We conclude that the circuit court sufficiently supported its decision denying maintenance to Bert and, therefore, did not erroneously exercise its discretion.  As noted above, the court does not err by failing to consider all of the statutory factors; the court need only consider relevant factors.  *See LeMere*, 262 Wis. 2d 426, ¶¶25-27.  The court's minimally sufficient discussion of maintenance specifically noted the applicability of WIS. STAT. § 767.56(1c)(e) and (f), addressing a party's earning capacity and the feasibility of a party becoming self-supporting.  Further, as Stephanie noted, the court stated that it reviewed all the factors under § 767.56(1c), which implies that it found the other factors irrelevant or, at least, insufficiently material to order maintenance paid by either party.  Thus, there is no basis in the record for us to find that the court erroneously exercised its discretion by denying maintenance to Bert.

¶50    As to the circuit court's property division decision, we have already discussed certain aspects of that decision in detail above.  We also reiterate that the court does not err by "giving one statutory factor greater weight than another, or [by] concluding that some factors may not be applicable at all."  *See LeMere*, 262 Wis. 2d 426, ¶25.  We further note that Bert's argument that the court failed to sufficiently address certain statutory factors within the property division decision is underdeveloped.  *See Papa v. DHS*, 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17 (declining to address an underdeveloped argument).  Bert does not explain how the examples he presents above would have made a difference in the outcome of the court's decision.  Further, he ignores our standard of review to the

extent that we search the record to support the court's decision. *See **Randall***, 235 Wis. 2d 1, ¶7.

## VI. *Offers of proof*

¶51 Finally, Bert contends that the circuit court's "order requiring 'offers of proof' instead of evidence deprived Bert of the right to present his case." The court allowed two days for testimony at trial, and during the second day, the court repeatedly reminded counsel to narrow the questions to the important issues in the case. At the conclusion of the second day, the court informed the parties that it would "hold open the record" for forty-five days to allow the parties to submit written submissions and "offers of proof."

¶52 We "will not disturb a circuit court's decision to admit or exclude evidence unless the circuit court erroneously exercised its discretion." *See **State v. Hunt***, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434. "Evidence erroneously admitted is subject to the harmless error rule." ***State v. Harris***, 2008 WI 15, ¶85, 307 Wis. 2d 555, 745 N.W.2d 397. "Application of the harmless error rule presents a question of law that this court reviews de novo." ***State v. Jackson***, 2014 WI 4, ¶44, 352 Wis. 2d 249, 841 N.W.2d 791 (citation omitted). Further, WIS. STAT. § 906.11(1) provides:

> The judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to do all of the following:
>
> (a) Make the interrogation and presentation effective for the ascertainment of the truth.
>
> (b) Avoid needless consumption of time.
>
> (c) Protect witnesses from harassment or undue embarrassment.

To that end, a court also has inherent power to "ensure that it 'functions efficiently and effectively to provide the fair administration of justice,' and to control its docket with economy of time and effort." *See* **State v. Casteel**, 2001 WI App 188, ¶23, 247 Wis. 2d 451, 634 N.W.2d 338 (citation omitted); *see also* **State v. Lenarchick**, 74 Wis. 2d 425, 457, 247 N.W.2d 80 (1976).

¶53    According to Bert, the circuit court improperly used offers of proof instead of testimony because offers of proof are not evidence.[6]  Specifically, Bert argues that he was denied the opportunity to present evidence on his maintenance claim, the withdrawal credit, personal property, and percentage ownership of the Fond du Lac property.[7]  He asserts that the court's ruling should therefore be reversed "because it affects Bert's substantial right to an accurate property division and maintenance," which cannot be harmless "because it directly contributed to denial of Bert's maintenance claim[] and at least three segments of property division."  Although Bert's argument is underdeveloped, we perceive him

---

[6] In support of his position that offers of proof are not evidence, Bert cites WIS. STAT. § 901.03(1), which provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected" and "[i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked." Sec. 901.03(1)(b).  He also notes that "[a]rguments or statements made by counsel during argument are not to be considered or given weight as evidence." *See* **Merco Distrib. Corp. v. O & R Engines, Inc.**, 71 Wis. 2d 792, 795-96, 239 N.W.2d 97 (1976).

[7] Bert contends that denying him the opportunity to present certain evidence at trial "had a material effect on the outcome" because that evidence would have (1) "[d]emonstrated the reasons for his $42,867 IRA withdrawal, which could have removed this sum from consideration on his share of the ledger"; (2) "[c]larified his requested items of personal property, instead of having Stephanie's list accepted wholesale"; (3) "[d]emonstrated that he, his brother, and [another individual] arranged for [that individual] to pay and own 2/3 of the 40-acre Fond du Lac parcel, not 1/3, reducing Bert's share by approximately $20,000 according to [the circuit] court's calculations"; and (4) "[o]utlined his maintenance request, as it was undisputed that he was currently earning less than Stephanie[] and having difficulty meeting expenses."

to be asserting a due process argument. Furthermore, he contends that he "was not allowed to testify regarding personal property or maintenance disputes, but then [he was] rebuked [by the court] for failing to do so."

¶54 We conclude that the circuit court did not erroneously exercise its discretion by allowing the parties to enter written submissions and offers of proof after trial in lieu of continuing the trial. Based on our review of the record, we are satisfied that the court took appropriate steps to manage the proceedings to ensure an efficient resolution of the parties' divorce dispute. In doing so, the court warned the parties repeatedly to remain on topic and it also allowed significant time for the parties to present post-trial evidence and argument.

¶55 Bert testified at trial, and he could have testified at that time to any of the issues he now identifies. He does not contend that *Stephanie* monopolized the presentation of evidence in any manner or otherwise prevented him from presenting his case; thus, under the circumstances, the fact that he ineffectively, inefficiently, or insufficiently presented his evidence does not support a determination that the circuit court erred. Further, although Bert argues that it was improper for the court to rely on offers of proof, Bert does not cite any relevant legal authority supporting this specific assertion. *See Pettit*, 171 Wis. 2d at 646. Bert was provided notice and the opportunity to be heard at trial, and the court did not exclude any of Bert's post-trial submissions. Thus, based on our review of the record, we cannot conclude that Bert's due process rights were violated.

¶56 Based on the foregoing, the circuit court properly exercised its discretion by limiting the time allowed for the presentation of evidence at trial and by allowing the parties the opportunity to present offers of proof in post-trial submissions. Further, Bert fails to show that if the allegedly excluded evidence

had been presented at the trial, it would have changed the outcome. Thus, to the extent the court erred by permitting the parties to file post-trial offers of proof, any such error was harmless.[8]

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[8] In terms of Bert's allegation that he was rebuked by the circuit court, we note that while the court identified Bert's failure to argue the issue of maintenance at trial, the court did not ultimately refuse to reach the issue on that basis in its decision. Thus, as Stephanie argues, "it is not as though Bert was precluded from presenting evidence. His post-trial submission was apparently not compelling, and thus did not yield Bert's desired results," which "does not constitute an erroneous exercise of discretion."